Opinion for the court filed by Circuit Judge HUGHES.
Dissenting opinion filed by Circuit Judge NEWMAN.
HUGHES, Circuit Judge.
Merck & Cie appeals from the Patent Trial and Appeal Board’s decision that the contested claims of its patent are invalid *831 for obviousness. Merck argues that the prior art taught away from the claimed method, and that objective indicia of non-obviousness further support the patenta-bility of the claims. Because the Board’s factual findings to the contrary were supported by substantial evidence and because we agree with the Board’s ultimate conclusion of obviousness, we affirm.
I
A
Merck owns U.S. Patent No. 6,011,040. At the request of Gnosis S.p.A., Gnosis Bioresearch S.A., and Gnosis U.S.A. (collectively, Gnosis) the- Board instituted inter partes review of claims 1-3, 5, 6, 8, 9, Ills, and 19-22 of the '040 patent. Merck filed a response and a motion to cancel claims 1-3, 5, 6, and 13, which the Board granted. Accordingly, the Board only reviewed the patentability of dependent claims 8, 9, 11, 12, 14, 15, and 19-22.
The '040 patent relates to methods of using folates to lower levels of homocy-steine in the human body. '040 patent, col. 111. 10-14. Homocysteine is an amino acid that, when present in excessive quantities, can cause severe cardiovascular, ocular, neurological, and skeletal disorders. Id. at col. 1 11. 60-62. One way the body regulates homocysteine levels is through a metabolic process called the methionine cycle, in which homocysteine is converted to methionine. A common cause of elevated homocysteine levels, or hyperhomocy-steinemia, is a deficiency of the enzymes and other compounds used in the methionine cycle to dispose of homocysteine. Id. at col. 11. 45.
One such compound is 5-methyl-tetrah-ydrofolic acid (5-MTHF). 5-MTHF is a reduced folate, meaning it is less oxidized than folic acid. 5-MTHF occurs naturally in foods, and is also produced when folic acid is metabolized in the body. The methionine cycle uses 5-MTHF and vitamin B12 to convert homocysteine to methionine.
There are two stereoisomers of 5-MTHF relevant here. Stereoisomers are compounds with the same chemical formula, but with different three-dimensional orientations. The “natural” stereoisomer of 5-MTHF is 5-methyl-(6S)-tetrahydrofolic acid or L-5-MTHF. The “unnatural” stereoisomer is 5-methyl-(6R)-tetrahydro-folic acid or D-5-MTHF, and is a mirror image of L-5-MTHF.
Claims 8 and 9 of the '040 patent recite a method of “preventing or treating disease associated with increased levels of homocysteine ... comprising administering at least one tetrahydrofolate in natural stereoisomeric form,” wherein the tetrahy-drofolate is L-5-MTHF or a salt thereof. '040 patent, col. 5 11. 26-31, 56-57, col. 6 11. 1.-3.
Claims 11 and 12 further require that the increased levels of homocysteine are associated with a deficiency of methylene tetrahydrofolate reductase, an enzyme that helps generate L-5-MTHF for the methionine cycle. Id. at col. 6 11. 7-17. In claims 14 and 15, the deficiency specifically involves thermolabile (i.e. easily affected by heat) methylene tetrahydrofolate reduc-tase. Id. at col. 6 11. 23-33.
Claim 21 limits the method in claim 11 to require administration of L-5-MTHF “in combination with at least one pharma-ceutically compatible active substance or at least one pharmaceutically compatible ad-juvant substance,” and claim 22 specifies that the pharmaceutically compatible active substance “comprises at least one B-vitamin.” Id. at col. 6 11. 49-56. Claims 19 and 20 apply the same “pharmaceutically compatible active substance” limitations to the method in claim 5, in which the administered tetrahydrofolate is one of a list of *832 compounds that includes L-5-MTHF. Id. at col. 5 11. 36-41.
B
The Board found that all of the contested claims were obvious in light of three prior art references: European Patent App. No. 0 595 005 (Serfontein); U.S. Patent No. 5,194,611 (Marazza); and Johan Ubbink et al., Vitamin B-12, Vitamin B-6, and Folate Nutritional Status in Men with Hyperhomocysteinemia, 57 Am. J. Clinical Nutrition, 47, 47-53 (1993) (Ub-bink).
Serfontein discloses “a pharmaceutical preparation for lowering levels of homocy-steine ... in a patient.” Serfontein, at 4 11. 37-39. Serfontein teaches that elevated levels of homocysteine are linked to numerous clinical defects, including cardiovascular problems such as precocious occlusive vascular disease; and abnormalities in the eyes, skeletal system, and central nervous system. Serfontein also explains that high levels of homocysteine are often associated with folate deficiencies, and are sometimes caused by hereditary enzyme deficiencies. Thus, to treat high levels of homocysteine, Serfontein discloses a preparation that includes “folate or a suitable active metabolite of folate,” along with vitamins B6 and B12. Id. at 11. 37-42.
Although Serfontein does not specify what constitutes a “suitable active metabolite of folate,” Marazza identifies L-5MTHF as a “natural metabolite” that may be used “as at least one active compound” in a treatment for folate deficiency. Marazza, col. 1 ll. 25-28. Marazza explains that commercially available forms of 5-MTHF at the time were mixtures of L-5MTHF and its enantiomer D-5-MTHF. Id. at col. 2 ll. 3-6. It then discusses previous studies suggesting that the unnatural enantiomer D-5-MTHF may interfere with the transport of folate through the cell membranes in humans. Id. at col. 2 11.16-20. To address this issue, Marazza teaches a process by which a mixture of these 5-MTHF stereoisomers may be separated into pure L-5-MTHF and D-5MTHF forms. Id. at col. 3 11. 32-36.
Ubbink is a study of folate levels in men with elevated levels of homocysteine. Ub-bink affirms that “[n]umerous studies have indicated that elevated plasma homocy-steine concentrations are associated with increased risk for premature vascular disease.” J.A. 836. It also states that the reasons for hyperhomocysteinemia include enzyme defects such as “cystathionine-a-synthase deficiency, or possession of a thermolabile variant of methylenetetrahy-drofolate reductase, an enzyme required in the remethylation of homocysteine to methionine.” J.A. 836 (citations omitted). Ubbink describes the positive results of treating these conditions with a vitamin supplement containing folic acid.
The Board found that, because of the close similarity of purpose and disclosure between Serfontein and Marazza, a person of ordinary skill in the art would have been motivated to combine the two references to arrive at a method of treating elevated levels of homocysteine with L-5-MTHF, as recited in claims 8, 9, 19, and 20 of the '040 patent. Further, the Board found a person of skill would have been motivated to use this method in the situation disclosed in Ubbink, in which the elevated homocysteine levels are associated with certain enzyme deficiencies. The Board found that this combination of Serfontein, Marazza, and Ubbink discloses the additional limitations of claims 11, 12, 14, 15, 21, and 22.
The Board also considered objective in-dicia of non-obviousness. The Board concluded that Merck failed to demonstrate an adequate nexus between the novel fea *833 tures of the '040 patent and the evidence of commercial success, licensing, copying, and industry praise. It also found that the evidence of long-felt but unmet need, unexpected results, and industry skepticism was unpersuasive.
Accordingly, the Board concluded that the asserted claims of the '040 patent would have been obvious to a person of ordinary skill at the time of the invention. The Board also found that Serfontein anticipates claims 8, 9, 19, and 20. And the Board construed the claims not to exclude the administration of a mixture that includes both L-5-MTHF and D-5-MTHF.
Merck appeals. We have jurisdiction •under 28 U.S.C. § 1295(a)(4)(A).
II
Merck appeals the Board’s obviousness determination, anticipation finding, and claim construction. Because we affirm the Board’s determinations that the asserted claims are invalid as obvious, we need not reach Merck’s arguments with respect to anticipation and claim construction.[1]
Obviousness is a question of law based on underlying findings of fact. In re Kubin, 561 F.3d 1351, 1355 (Fed.Cir.2009). The factual findings include: “(1) the scope and content of the prior art; (2) the differences between the prior art and the claims at issue; (3) the level of ordinary skill in the art at the time the invention was made; and (4) objective evidence of nonobviousness, if any.” Id.; see also Graham v. John Deere Co., 383 U.S. 1, 17-18, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966). If all elements of the claims are found in a combination of prior art references, as is the case here, the factfinder should further consider whether a person of ordinary skill in the art would be motivated to combine those references, and whether in making that combination, a person of ordinary skill would have a reasonable expectation of success. Medichem, S.A. v. Rolabo, S.L., 437 F.3d 1157, 1164 (Fed.Cir.2006). In appeals of Board decisions, these factual findings are reviewed for substantial evidence. In re Gartside, 203 F.3d 1305, 1313 (Fed.Cir.2000); see also In re Cuozzo Speed Techs., LLC, 793 F.3d 1268, 1280 (Fed.Cir.2015). Based on the underlying factual findings, we review the Board’s ultimate conclusion of obviousness de novo. In re Mouttet, 686 F.3d 1322, 1330-31 (Fed.Cir.2012).
The Board’s finding of a motivation to combine Serfontein, Marazza, and Ubbink to arrive at the claimed method was supported by substantial evidence. So was the Board’s finding that the proffered evidence of objective indicia of non-obviousness lacked an adequate nexus with the merits of the claimed invention. In light of these factual findings, we agree with the Board’s ultimate conclusion that the asserted claims were obvious under 35 U.S.C. § 103.
A
The record amply supports the Board’s finding of a motivation to combine Serfontein and Marazza. Serfontein explains that elevated levels of homocysteine are often associated with folate deficiencies. Accordingly, Serfontein discloses a method of treating elevated levels of homo-cysteine using a “suitable active metabolite of folate” and B-vitamins. While Serfontein does not specifically identify which metabolites of folate are “suitable” for ad *834 dressing folate deficiencies, Marazza does. It highlights L-5-MTHF as a “natural metabolite” of folate in which there is an “increasing interest” for the treatment of folate deficiencies. Marazza, col. 1 11. 26-29. Thus, as the Board found, a person of ordinary skill viewing Serfontein and Mar-azza would have been motivated to use L-5-MTHF as the “suitable active metabolite of folate” called for by the method disclosed in Serfontein.
Merck argues that the prior art teaches away from this combination by suggesting: (1)' administering 5-MTHF would actually increase levels of homocysteine, (2) 5-MTHF would be too unstable for therapeutic use, and (3) L-5-MTHF is a poor substrate for polyglutamation, a process that facilitates retention and use of L-5MTHF in the cell. Merck cites isolated prior art disclosures for support. Viewing the prior art as a whole, however, the Board’s finding that the prior art does not teach away from combining Serfontein and Marazza is supported by substantial evidence.
The prior art does not unambiguously teach that administration of 5-MTHF would increase homocysteine levels. Merck relies on two prior art references: Harpey 1, a journal article discussing the treatment of an infant with chronically high levels of homocysteine; and Harpey 2, a letter to the editor of the journal with updates on that treatment. See J.A. 1253-57. Merck argues that, based on its expert testimony, these references show that administration of 5-MTHF increases ho-mocysteine levels, because the infant’s ho-mocysteine levels rose during administration of 5-MTHF from 0 mol/L to 13 mol/L. But this conclusion relies on the wrong starting point. Prior to treatment, the infant’s homocysteine levels were 233 mol/L, whereas 0 mol/L was normal. Only after a variety of other treatments were the infant’s levels of homocysteine reduced to 0 mol/L. Thus, although switching to 5-MTHF may have correlated with a slight increase in homocysteine, the net effect is still a reduction of homocysteine levels. Moreover, the researchers themselves seemed to think that 5-MTHF controlled the infant’s homocysteine levels. If they thought otherwise, they would have terminated treatment for that reason, given that the infant’s symptoms from elevated homo-cysteine levels were severe. But they did not. Instead, the stated reason for eventually withdrawing 5-MTHF was “because of its instability.” J.A. 1257. Given this context, substantial evidence supports the Board’s finding that a person of ordinary skill would not understand the Harpey references to teach that 5-MTHF would increase previously untreated homocysteine levels.
Nor does the prior art compel a finding that a person of ordinary skill would have thought 5-MTHF was too unstable for therapeutic use. The Harpey references, published in 1981 and 1983 respectively, certainly suggest 5-MTHF was unstable. Harpey 1 states that “[although [5-MTHF] would be desirable for use in therapy, it is probably too unstable.” J.A. 1255. Harpey 2 explains that treatment with 5-MTHF “had to be withdrawn because of its instability.” J.A. 1257. But subsequent references disclose that 5-MTHF is suitable for pharmaceutical use. A study published in 1986 explains that although prior “[sjtudies of MTHF ... were hampered by its chemical instability[,][a] new and stable preparation of MTHF has become available for clinical trials.” J.A. 1243 (Reggev reference); see also J.A. 3188 (Pattini reference discussing 1988 study in which 5-MTHF was administered to cross-country skiers daily); J.A. 840 (Godfrey reference reporting 1990 study in which 5-MTHF was administered to treat psychiatric disorders). And in *835 1990, the Marazza reference clearly identified L-5-MTHF as a suitable compound for treating folate deficiency. Marazza, col. 1 11. 25-28. Because the prior art must be considered as a whole, Medichem, 487 F.3d at 1166, the Board’s finding that a person of ordinary skill would not have thought that 5-MTHF was too unstable for pharmaceutical use is supported by substantial evidence.
Finally, although some prior art references suggest that L-5-MTHF is a poor substrate for polyglutamation, others disclose that L-5-MTHF is nonetheless effective for treatment of elevated homocy-steine levels. Merck argues that because L-5-MTHF was understood to have a poor capacity for polyglutamation, a process that helps retain folates in the cell, a person of ordinary skill at the time would have thought that L-5-MTHF does not accumulate within the cell, where the conversion of homocysteine to methionine occurs. According to Merck, a person of skill would therefore would have been discouraged from using L-5-MTHF to lo'vyer homocysteine levels.
This argument, however, ignores other prior art disclosing that 5-MTHF does, in fact, accumulate in the cell. The Wagner reference states that at least 20% of 5-MTHF was retained within the cell in that study, as Merck conceded before the Board. J.A. 512, 2068. And another reference, Regland, teaches that 5-MTHF was the “drug of choice” because “MTHF is the form of folate that is taken up by the cells.” J.A.. 851. Accordingly, the prior art as a whole supports the Board’s conclusion that a person of ordinary skill would not have avoided L-5-MTHF because it does not accumulate within the cells.
Merck further argues that L-5MTHF’s poor capacity for polyglutamation makes it a less effective substrate for the enzymes involved in converting homocy-steine to methionine. Merck seizes on a prior art statement that “[m]etabolism of folates to polyglutamates [i.e. polygluta-mation] is required for their biological activity because polyglutamate forms are much more effective substrates for folate-dependent enzymes than are the monoglu-tamate derivatives.” J.A. 1313 (declaration of Dr. Gregory (quoting article by Dr. Shane)). Merck also points to an isolated statement in the Wagner reference that “under the conditions of the present study, isolated [liver cells] did not significantly metabolize [5-MTHF].” J.A.2070.
Again, other prior art references show that 5-MTHF would nonetheless be effective for lowering homocysteine levels. The Ueland reference discloses, and Merck agrees, that folic acid is an effective means of decreasing homocysteine levels. And according to Ueland, folic acid accomplishes this reduction by “increas[ing] the intracellular pool of [5-MTHF] which in turn may serve as a methyl-donor in the [methionine cycle].” J.A. 801. Merck failed to present credible evidence that 5-MTHF derived from folic acid is any more capable of polyglutamation in the cell or any more effective as a substrate for fo-late-dependent enzymes than natural L-5MTHF administered directly. Indeed, a 1989 reference concludes that directly administered 5-MTHF is actually more efficient than folic acid: “In some cells, the concentration of folic acid required to generate adequate concentrations of intracellular folates is 100-200 times that of reduced folates such as [5-MTHF].... ” J.A. 1275. And other references disclose that 5-MTHF is effective for treating symptoms associated with folate deficiency. See Marazza, col. 111. 25-28; J.A. 840 (Godfrey reference); J.A. 844 (Regland reference). In view of these references, a person of skill in the art would have had reason to use L-5-MTHF instead of folic acid, not *836 withstanding prior suggestions that L-5MTHF has a poor capacity for polygluta-mation. Accordingly, the record amply supports the Board’s finding that a person of ordinary skill would not understand the prior art to teach away from using 5-MTHF based on its capacity for polygluta-mation.
Serfontein specifically calls for a “suitable active metabolite of folate” to help lower homocysteine levels, and Marazza provides that L-5-MTHF is one such metabolite. The Board properly concluded that any doubt about the suitability of L-5-MTHF was overcome by the weight of the prior art. We therefore conclude that substantial evidence supports the Board’s finding that a person of ordinary skill would have been motivated to use L-5 MTHF to treat elevated levels of homocysteine in the manner recited in claims 8, 9, 19, and 20 of the '040 patent.
The Board’s additional finding of a motivation to use the method disclosed in Ser-fontein and Marazza to treat elevated ho-mocysteine levels associated with certain enzyme deficiencies, as disclosed in Ub-bink, is also supported by substantial evidence. Merck’s sole argument against this finding is that Ubbink used folic acid, not reduced folates such as L-5-MTHF, to treat elevated levels of homocysteine associated with certain enzyme deficiencies. As the Board found, however, this distinction would not have undermined a person of ordinary skill’s motivation to combine. Ubbink involved a deficiency in the enzyme methylenetetrahydrofolate reduc-tase. According to the prior art, this enzyme is important because it helps produce 5-MTHF for the methionine cycle. J.A. 786 (Ueland reference). A deficiency in this enzyme, therefore, reduces the amount of 5-MTHF available for converting homocysteine to methionine. Id. In Ub-bink, patients with this deficiency were treated using folic acid, which reduces ho-mocysteine levels by increasing the intracellular pool of 5-MTHF. J.A. 801 (Ue-land reference). As mentioned above, a person of skill would have known that administering 5-MTHF directly would accomplish a similar result. See J.A. 1275 (study suggesting 100-200 times more folic acid would be needed to match the results of directly administered 5-MTHF); Mar-azza, col. 1 11. 25-28 (describing 5-MTHF as a popular supplement for the treatment of folate deficiency). Thus, the record supports the Board’s finding that the method of using L-5-MTHF disclosed in Serfontein and Marazza was a natural alternative to using folic acid when elevated homocysteine levels are associated with enzyme deficiencies, as disclosed in Ub-bink. The resulting combination discloses each limitation of claims 11, 12, 14, 15, 21, and 22.
In a final challenge to the Board’s decision, Merck complains that the Board never made an express finding that a person of ordinary skill would have a reasonable expectation of success in combining Ser-fontein and Marazza, or in further combining Serfontein, Marazza, and Ubbink. Under KSR International Co. v. Teleflex Inc., 550 U.S. 398, 418, 127 S.Ct. 1727, 167 L.Ed.2d 705, (2007), a factfinder’s analysis-of a reason to combine known elements in the art “should be made explicit.” But KSR does not require an explicit statement of a reasonable expectation of success in every case. Cf id. at 419,127 S.Ct. 1727 (cautioning against confining the obviousness analysis using formalistic rules). Here, the Board addressed Merck’s arguments against a reasonable expectation of success in the context of its teaching away arguments. By rejecting Merck’s argument that the prior art taught away from combining Serfontein, Marazza, and Ub-bink, the Board impliedly found a reasonable expectation of success. We decline to *837 overturn the Board’s decision for failure to state expressly that a person of ordinary skill would have had a reasonable expectation of success.
Merck fails to establish that the Board’s factual determinations are not supported by substantial evidence. In light of those findings, we agree with the Board that the prior art and expert testimony present strong evidence of obviousness.
B
Objective indicia of nonobviousness can serve as an important check against hindsight bias and “must always when present be considered.” In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Patent Litig., 676 F.3d 1063, 1075-76 (Fed.Cir.2012) (quoting Stratoflex, Inc. v. Aeroquip Corp., 713 F.2d 1530, 1538-39 (Fed.Cir.1983)). Even when present, however, objective indicia “do not necessarily control the obviousness determination.” Bristol-Myers Squibb Co. v. Teva Pharm. USA, Inc., 752 F.3d 967, 977 (Fed. Cir.2014).
 “For objective evidence of secondary considerations to be accorded substantial weight, its proponents must establish a nexus between the evidence and the merits of the claimed invention.” In re Huai-Hung Kao, 639 F.3d 1057, 1068 (Fed.Cir.2011) (quoting Wyers v. Master Lock Co., 616 F.3d 1231, 1246 (Fed.Cir.2010)). Where objective indicia “result!] from something other than what is both claimed and novel in the claim, there is no nexus to the merits of the claimed invention.” Id. “To the extent that the patentee demonstrates the required nexus, his objective evidence of nonobviousness will be accorded more or less weight.” In re GPAC Inc., 57 F.3d 1573, 1580 (Fed.Cir.1995).
Here, the Board properly considered Merck’s evidence regarding objective indicia of nonobviousness, but found that the nexus between the merits of the invention and the evidence of commercial success, licensing, copying, and industry praise was weak. The Board also found the evidence of long-felt but unmet need was unpersuasive. The Board therefore afforded the evidence of objective considerations little weight. We conclude that these factual findings are supported by substantial evidence. ■
Merck’s evidence of commercial success relates to several products manufactured and sold by Merck’s licensee, Pamlab (the Pamlab products). The Metanx®, Cerefo-lin®, CerefolinNAC®, Néevo®, and Née-voDHA® products contain L-5-MTHF in addition to other active ingredients. In the Deplin® product, the only active ingredient is L-5-MTHF. Deplin® is intended for use as a supplemental treatment • of major depressive disorder (MDD) or schizophrenia.
As the Board found, the “mixed” products — Metanx®, Cerefolin®, Cerefolin-NAC®, Néevo®, and NéevoDHA® — have material features beyond those disclosed and claimed in the '040 patent. While the asserted claims most closely related to these products recites a method of treating elevated homocysteine levels using a mixture of L-5-MTHF and “at least one B-vitamin,” see '040 patent, col. 6 11. 46^18 (claim 19); id. at 11. 54-55 (claim 21), these products go further and contain a specific combination of specific forms of B-vitamins and other active ingredients. For example, the Cerefolin® product combines L-5MTHF with specific quantities of riboflavin (vitamin B12), cyanocobalamin (a form of vitamin B12), and pyridoxine hydrochloride (a form of vitamin B6). Merck failed to establish that the commercial success of these products was due to the claimed *838 method — using L-5-MTHF and “at least one B-vitamin” — as opposed to the specific formulations in the mixed products. Indeed, a Pamlab executive stated that the success of two of these products was due to the “unique combination” of their ingredients. J.A. 1855-56; see also J.A. 1542 (expert stating that effectiveness of Me-tanx® “was likely due to the synergistic interactions of its components”). Thus, the Board’s finding that this evidence of commercial success should be afforded little weight was supported by substantial evidence.
The alleged nexus between the asserted claims ■ and the Deplin® product was also tenuous. “If commercial success is due to an element in the prior art, no nexus exists.” Tokai Corp. v. Easton Enters., Inc., 632 F.3d 1358, 1369 (Fed.Cir.2011). The Board identified two prior art references disclosing compounds containing 5-MTHF that were used to treat depression associated with folate deficiencies, just like the Deplin® product. The Godfrey reference describes a study in which administering 5-MTHF improved the recovery of patients with major depression or schizophrenia and a folate deficiency. Similarly, the LeGrazie reference discloses the use of 5-MTHF to treat a subject with “organic mental disturbances with depression of mood.” J.A. 750. Thus, substantial evidence supports the Board’s finding that the use of 5-MTHF for treating major depressive disorder and schizophrenia was known in the prior art, and therefore Merck could not show a sufficient nexus between the commercial success of the Deplin® products and the novel features in the asserted claims.
Merck’s evidence of copying and industry praise was based on the same Pamlab products. Like the evidence of commercial success, Merck failed to show an adequate nexus between these objective indi-cia and the novel features of the asserted claims. Thus, substantial evidence supports the Board’s finding that evidence copying and industry praise is entitled to little weight.
Merck’s evidence of licensing is similarly unavailing. Although Merck successfully licensed the '040 patent to Pamlab, the licensing agreement also covered several other patents. One of those patents claims the stable form of L-5-MTHF used in Pamlab’s products more precisely than the '040 patent. See U.S. Patent No. 6,441,168. A Pamlab executive explained that Pamlab desired this stable form “[b]e-cause of its uniqueness and its novel properties,” J.A. 3879, and touted the ingredient as “[o]ne particular differentiator that makes our product unique,” J.A. 1848. It is therefore difficult to determine the extent to which the licensing agreement was a result of the novel features in the '040 patent, as opposed to the other patents involved. In light of this ambiguity, the Board’s finding that the evidence of licensing should not be afforded much weight was reasonable.
Finally, Merck alleges that the '040 patent resolved a long-felt but unmet need for a supplemental therapy for treating MDD. As mentioned, however, substantial evidence supports the Board’s finding that the prior art disclosed the use of 5-MTHF to treat depression associated with folate deficiencies, such as MDD. Merck’s argument that the '040 patent met a long-felt need for MDD treatment, therefore, is not sufficiently connected with the novel elements of the asserted claims.
Although another factfinder may have reasonably evaluated Merck’s evidence of objective indicia of non-obviousness differently in the first instance, the Board’s conclusion that this evidence was not persuasively tied to the novel features of the asserted claims is supported by substantial *839 evidence. In light of this finding, we agree with the Board that these objective indicia carry little weight.
Ill
The Board found persuasive evidence that the claimed method of treating elevated levels of homocysteine would have been obvious to a person of skill in light of the prior art, particularly Serfontein, Marazza, and Ubbink. And the Board .found that Merck’s evidence of objective indicia of non-obviousness was not closely tied to the allegedly novel features of the claimed invention. These findings were supported by substantial evidence and, on balance, provide strong evidence of obviousness. We therefore agree with the Board’s ultimate legal conclusion that claims 8, 9, 11, 12,14,15, and 19-22 of the '040 patent are invalid under 35 U.S.C. § 103.
AFFIRMED

. During oral argument, Merck agreed that even if the Board's claim construction is incorrect, it did not affect the obviousness determination. See Oral Argument at 1:47, Merck & Cie v. Gnosis S.P.A., No. 14-1779 (Apr. 7, 2015), available at http:// oralarguments. cafc.uscourts. gov/default. aspx? fl=2014-1779.mp3.